1

```
1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
2                          CENTRAL DIVISION

3

4   UNITED STATES OF AMERICA,      .
                                   . Case No. 4:21-MJ-00306-ERE-1
5   PLAINTIFF,                     .
                                   .
6   VS.                            . Little Rock, Arkansas
                                   . December 29, 2021
7   DAVYON ROBERTS,                . 2:11 P.M.
                                   .
8   DEFENDANT.                     .
    . . . . . . . . . . . . . . . .
9

10

11                          TRANSCRIPT OF

12                       DETENTION HEARING

13              BEFORE THE HONORABLE EDIE R. ERVIN

14                 UNITED STATES MAGISTRATE JUDGE

15

16

17  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Tenesha Brown

18

19

20  Transcription Service:            Robin Warbritton
                                      Post Office Box 262
21                                    Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

```
 1   APPEARANCES:

 2   For the Government:      Ms. Lauren Eldridge
                             U.S. Attorney's Office
 3                           Eastern District of Arkansas
                             Post Office Box 1229
 4                           Little Rock, AR  72203-1229

 5   For the Defendant:      Mr. Blake Byrd
                             Federal Public Defenders Office
 6                           The Victory Building
                             1401 West Capitol Avenue
 7                           Suite 490
                             Little Rock, AR  72201
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|                            | DIRECT | CROSS | REDIRECT | RECROSS |
|----------------------------|--------|-------|----------|---------|
| GOVERNMENT'S WITNESS:       |        |       |          |         |
| James O'Connor              | 4      | 18    |          |         |
|                            |        |       |          |         |
| DEFENDANT'S WITNESS:        |        |       |          |         |
| LaQuanna Jones              | 33     | 43    |          |         |

4

1                     P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURT:  Good afternoon.

4            MS. ELDRIDGE:  Good afternoon, Your Honor.

5            THE COURT:  Mr. Byrd, Ms. Eldridge.

6            MR. BYRD:  Good afternoon.

7            THE COURT:  We're here today for a detention hearing

8   in the case of *United States of America v. Davyon -- Davyon*

9   *Roberts*, case number 4:21-MJ-306.

10           Mr. Roberts appeared before me on December 23rd for

11  initial appearance on a complaint.  The Government requested

12  detention, and we're here today on the issue of whether I can

13  set conditions of release for Mr. Roberts.

14           Are counsel for both sides ready to proceed?

15           MS. ELDRIDGE:  Yes, Your Honor.

16           MR. BYRD:  Yes, Your Honor.

17           THE COURT:  Ms. Eldridge, you may call your first

18  witness.

19           MS. ELDRIDGE:  Thank you, Your Honor.  The Government

20  calls Special Agent James O'Connor.

21           THE COURT:  Please come forward and face my Courtroom

22  Deputy to be sworn.

23       (JAMES O'CONNOR, GOVERNMENT'S WITNESS, SWORN.)

24                      DIRECT EXAMINATION

25  BY MS. ELDRIDGE:

1  Q    Good afternoon.

2  A    Good afternoon.

3  Q    Can you please state your full name for the record?

4  A    James O'Connor.

5  Q    And, Agent O'Connor, what is your occupation?

6  A    I'm a Special Agent with the Bureau of Alcohol, Tobacco,

7  Firearms, and Explosives, and I've been with the ATF since

8  January 2017.

9  Q    Okay.  And as part of your work with the ATF, were you

10 involved in an investigation into an incident that occurred on

11 December 20th of this year involving Davyon Roberts?

12 A    Yes.

13 Q    Okay.  And can you tell the Court, I want to start with

14 how you got to December 20th; did that, in fact -- did

15 something happen before December 20th that led you to this

16 incident?

17 A    Something happened on December 19th which led

18 investigators to what happened on the 20th.

19 Q    All right.  Will you tell the Court about that?

20 A    Yes.  On December 19th, 2021, Little Rock police officers

21 responded to the area of West 36th Street and John Barrow Road

22 in reference to a shots fired call for service.  Multiple

23 rifle casings were later located at the intersection.  Later

24 that night, officers responded to 9601 Baptist Health Drive in

25 reference to two shooting victims being located deceased

1  inside of their vehicle.  Homicide detectives and the Crime

2  Scene Unit with Little Rock responded and began their

3  preliminary investigation.  And throughout that investigation,

4  Little Rock homicide detectives located a suspect vehicle

5  through surveillance footage, and identifying that suspect

6  vehicle is what led us to December 20th.

7  Q   And what did the suspect vehicle look like?

8  A   It was a blue Crown Victoria.

9  Q   And was that bright blue?

10 A   It's blue.

11 Q   Okay.

12 A   It's blue.

13 Q   And did local law enforcement later locate that blue Crown

14 Victoria?

15 A   Yes, they did.  They -- they located that Crown Victoria

16 on the 20th, and that was at 6421 Amalie Drive in Bryant,

17 Arkansas.

18 Q   And what did they do when they located that vehicle?

19 A   Detectives established surveillance of the residence, and

20 when that vehicle left, Bryant Police Department conducted a

21 traffic stop on that car.

22 Q   And who did they make contact with in that car?

23 A   Davyon Roberts.

24 Q   And was he the only occupant?

25 A   He was.

1  Q   And what did they do when they made contact with him?

2  A   They had Mr. Roberts step out of the vehicle, and homicide

3  detectives met with him, as well as the Bryant police officer,

4  and they had a discussion.  And the Bryant police officer was

5  going to be putting Mr. Roberts in his vehicle, and because of

6  that, he conducted a pat down of Mr. Roberts.  And during that

7  pat down, a Glock switch fell out of his pocket onto the

8  pavement.

9  Q   Okay.  What's a Glock switch?

10  A   It's a machine gun conversion device.  It's a -- it's a

11  device that can make a semiautomatic Glock pistol shoot fully

12  automatic.

13  Q   And what does it look like?

14  A   It looks like a Lego square.  It has -- it can have a pin

15  in the back.  They come all -- all different ways.  Some of

16  them manufactured.  Some of them have Glock stamped on the

17  back of it.  Some of them are 3-D printed.  But it looks like

18  a -- generically, it looks like a Lego with an arm or a leg

19  sticking out of it.

20  Q   And where does that affix to a firearm?

21  A   It affixes to the back plate.  So you remove the back

22  plate of the Glock and you install the Glock switch and it's

23  ready to go.

24  Q   And in your training or experience as an ATF agent, do you

25  have any knowledge of -- of how long it takes to either

O'Connor - Direct                                     8

1  install or uninstall a Glock switch?

2  A    It depends on how handy somebody is, but it doesn't take

3  -- it doesn't take much at all and can sometimes take a minute

4  to do if you've done it multiple times, or you can even see

5  videos on it.

6  Q    Okay.  And so, you mentioned the Glock switch was located

7  in Mr. Roberts' pocket during a pat down search, right?

8  A    Yes.  It was in his pocket, and during the pat down it

9  fell onto the ground.

10 Q    Okay.  And once officers saw that device, what was their

11 next move?

12 A    Call ATF.

13 Q    Okay.  And did they, in fact, search the car?

14 A    They did not.  They -- well, they secured the vehicle and

15 had it towed to the Little Rock Crime Scene Bay, where a

16 search warrant was later executed on that car.

17 Q    Okay.  And what, if anything, was located during the

18 execution of that search warrant?

19 A    A Glock pistol, as well as an extended magazine, several

20 rounds of various ammunition.

21 Q    Was that located inside the extended magazine?

22 A    There was ammunition in the extended magazine, as well as

23 ammunition in the glove compartment of the -- of the Crown

24 Vic.  Yes.

25 Q    Was the Glock itself loaded?

O'Connor - Direct                                    9

1   A   I don't know.

2   Q   Okay.  Where was that firearm located?

3   A   It was located underneath the driver's seat.

4   Q   Okay.  And you mentioned that when local law enforcement

5   conducted a traffic stop, they waited until someone got into

6   the car to actually perform the traffic stop; did the car

7   travel for a period of time before they -- before the driver

8   stopped the car?

9   A   My understanding, from talking to Little Rock detectives,

10  is that the -- the vehicle traveled a little bit, maybe a

11  mile, before Roberts eventually pulled over.

12  Q   Do you know who the car belonged to?

13  A   No.  But Mr. Roberts referred -- referred to it as his

14  car.

15  Q   Okay.  Well, is this, to your knowledge, Mr. Roberts'

16  first experience with -- with law enforcement?

17  A   No, it's not.  But before we -- if we -- if you don't

18  mind, if we could go back to the firearm that was located

19  under the seat, that it's important to note that that firearm

20  was missing a back plate, which, for a Glock switch to be

21  installed, the back plate would have to be removed.

22  Q   So, to ATF, it appeared as though the Glock was either

23  ready to have a switch put in it or just had a switch taken

24  off of it; is that accurate?

25  A   Yes.  It didn't have a back plate.  And to not have a back

1   plate on it is essential for a Glock switch to be on there.

2   Q   Okay.  Then talking about the defendant's past run-ins

3   with -- with local law enforcement, are you familiar -- fairly

4   familiar with his history?

5   A   Yes, I am.

6   Q   Okay.  And when -- when was his first -- when was he first

7   mentioned in a report with local law enforcement?

8   A   That would be March of 2016, I believe.

9   Q   And I guess I should ask, while we're talking about dates

10  and ages, do you -- are you familiar with the defendant's date

11  of birth?

12  A   Yes, he was born in 2003.  I'm not sure which month.

13  Q   Does March 7th of 2003 sound accurate to you?

14  A   March 7th does.  Yes.

15  Q   Okay.  And so, you said that his first -- the first time

16  his name shows up in a police report is in March of 2016,

17  correct?

18  A   Correct.

19  Q   Prior to his birthday, which would make him approximately

20  12 years old?

21  A   Yes.

22  Q   And what -- just briefly, what was the substance of that

23  report?

24  A   Just briefly, the substance of the report would be that it

25  was a breaking and entering of a vehicle.  Three young

1    juveniles.  They had a stun gun when they broke into the other

2    car.  Officers made contact with -- with one of the cars as a

3    possible suspect -- okay, they made contact with three

4    individuals as possible suspects.  They told the officer that

5    last night three other kids they know from Cloverdale Middle

6    School, known as Jaylon -- Davarius (phonetic) and Jaylon

7    (phonetic) came up to them and had a gun and a taser during

8    the time frame.  They ran away from them.

9    Q    Have you followed this -- do you know whether or not this

10   event was charged against them juvenile?

11   A    No, I don't.

12   Q    And Mr. Roberts was just named as a suspect in this

13   report?

14   A    Yes.

15   Q    Okay.  What's the -- what's the next incident that -- that

16   you've seen his name show up in, in a police report?

17   A    He's actually listed as an other person contact in that --

18   Q    Okay.

19   A    -- in that first report.

20   Q    Okay.  But his name was still generated --

21   A    Yes.

22   Q    -- in that report?

23   A    Yes.

24   Q    Okay.  And when is the next time his name shows up in a

25   police report?

1  A    The next one I have is October 4th of 2016.

2  Q    Okay.  And he was approximately 13 at that time?

3  A    Yes.

4  Q    And what's the substance of that report?

5  A    Basically, that -- that he popped a teacher with a piece

6  of paper from a rubber band.  He threw a piece of paper at

7  her.

8  Q    So, a school complaint?

9  A    Yes.

10 Q    And what's the next time after that that he shows up in a

11 police report?

12 A    August of 2017, and the substance of this report is

13 basically him and a couple other guys were throwing toilet

14 rolls -- toilet paper rolls into traffic.

15 Q    Okay.  And the one -- the next report after that?

16 A    The next report after that was in September of 2017, and

17 that was Roberts and several other people -- I'll just read

18 it.

19             "Zawauna (phonetic) Holmes advised

20             her son, Ziondrick (phonetic)

21             Jones, ran away from the

22             residence.  She said he had been

23             driving around and looking for

24             him.  A runaway broadcast was

25             made.  And she advised to call

1                   back if he returns.  Holmes

2                   returned back a short time later

3                   and said Ziondrick was sitting in

4                   a truck outside of the apartment.

5                   He was observed to be with two

6                   other juveniles, Dondre Lowe

7                   (phonetic) and Davyon Roberts."

8    Q    Okay.  So, was that a curfew incident?

9    A    Yes.

10   Q    Okay.  And the last two reports you mentioned, he was

11   approximately 14 years of age at that time?

12   A    About, yes.

13   Q    All right.  Let's get into some of the reports he's

14   mentioned in when he turns 15.  What is the next report you

15   have after that curfew incident?

16   A    This next report would be October 2020, and it's a

17   breaking and entering and stolen gun report.

18   Q    Breaking and entering into a vehicle?

19   A    Yes.

20   Q    And, in fact, are there three different incidents that day

21   in which he's mentioned as a suspect?

22   A    There are.

23   Q    Okay.  And after October 13th of 2020, the breaking and

24   enterings, what's the next report that he is listed in?

25   A    The next report is October 20th of 2020, and that's a

1  theft by receiving and a minor in possession of a firearm.

2  Q   Okay.  And that's just seven days after the previous

3  report?

4  A   Yes.

5  Q   And I believe that brings us to this year.  After the

6  October 20th, 2020 incident, where he's charged with theft by

7  receiving, minor in possession of a handgun in juvenile court,

8  what is the next incident that he is listed in the report in?

9  A   The next incident is a -- is an aggravated assault.  It

10 was a large scale shooting that occurred in Otter Creek.

11 Q   Okay.  Can you elaborate on what occurred during that

12 incident?

13 A   Yes.  On February 20th, 2021, patrol officers with the

14 Little Rock Police Department responded to 14000 Otter Creek

15 Parkway for a shooting just occurred call for service.

16 Officers showed up, made contact with a large crowd of

17 apparent juvenile suspects.  And patrol officers secured the

18 scene, allowing MEMS to come in an treat a victim, Jakyra

19 (phonetic) Tucker-Williams, who was suffering from an apparent

20 gunshot wound to the leg, her left thigh to be more specific.

21 Ms. Tucker was brought to the hospital and medical

22 professionals informed Little Rock -- the Little Rock Police

23 Department that Ms. Tucker-Williams had a shattered femur and

24 would need surgery for the -- for the injury.  Detectives went

25 out and conducted several, several interviews of some of the

O'Connor - Direct                                      15

1  people who were there, and it appeared apparent that the

2  reason for the gathering there was that there were females to

3  fight -- that were going to fight over an ongoing social media

4  dispute.  One of the females said that she observed a group of

5  boys running across the street at them and they just started

6  shooting.

7  Q    And were detectives able to I.D. Mr. Roberts as one of

8  those suspects involved in the shooting?

9  A    Yes, they were.

10 Q    And to be clear, they didn't I.D. him as the person who

11 shot the victim?

12 A    No.

13 Q    Okay.

14 A    No.

15 Q    But they were able to identify him as involved in having a

16 firearm and shooting it at that location?

17 A    Yes.  There were -- there were six individuals who were

18 involved.  So, basically, after looking at video surveillance,

19 there was six individuals who were essentially stacked on a

20 wall, and then came out behind this building, and all six of

21 them had firearms, and one of them shot Ms. Tucker-Williams,

22 and the others were just shooting in the air or shooting

23 about.  There were several residences that got struck and at

24 least one vehicle that I know of.

25 Q    And, in fact, was he charged with that incident?

1  A   Yes, he was.

2  Q   He's no longer listed as a suspect, he's actually charged

3  in that incident?

4  A   He is.

5  Q   And that's a pending case in juvenile court?

6  A   I don't know if it's juvenile or circuit court.

7  Q   Okay.  So that was on February 28th of 2021.  What's the

8  next incident?

9  A   The next incident is on July 25th, 2021.  And that

10 occurred at almost 4:00 in the morning.  Officers respond --

11 officers with the Little Rock Police Department responded to 7

12 Lark Place in reference to a disturbance with a weapon.

13 Officers made contact with individuals, including Davyon

14 Roberts.  Roberts and an individual, Dillon Holmes, told

15 officers they were being shot at by the -- by a resident on 9

16 Lark Place.  Officers located, in front of seven -- located

17 multiple spent casings in front of 7 Lark Place, which is

18 where I believe Roberts and Holmes were, and noticed that 9

19 Lark Place had multiple apparent bullet strikes.  Officers

20 also made contact with an individual at 9 Lark Place, who was

21 Mr. Alvictor Denton.

22     Mr. Holmes and Mr. Roberts were interviewed, waived their

23 rights, and provided detectives with a recorded statement.

24 Mr. Roberts said that he observed a black male at 9 Lark Place

25 holding a rifle.  Mr. Roberts stated the black male began

1  shooting at him, and Mr. Roberts ran back inside.  Mr. Roberts

2  did not have a firearm during that incident.  Now, Mr. Holmes

3  stated that Mr. Roberts exited the residence at 7 Lark Place

4  with a gun, and more gunfire was heard.  A search and seizure

5  warrant was executed at 7 Lark Place.  That's the address

6  where Roberts was.  And a Draco AK-47 pistol, it's an AK type

7  pistol, was recovered along with other firearm accessories.

8  Mr. Holmes told detectives that the Draco belonged to Mr.

9  Roberts, and Mr. Roberts was seen carrying it -- carrying it

10 around returning to the house.

11 Q   And by this time, the defendant has turned 18, correct?

12 A   Yes.

13 Q   And so, is that a pending charge in circuit court?

14 A   Yes, it is.

15 Q   And to your knowledge, on that July 25th incident that he

16 was arrested for, did he -- did he bond out of jail on those

17 charges?

18 A   That's my understanding.

19 Q   Okay.

20        MS. ELDRIDGE:  I have no further questions at this

21 time, Your Honor.

22        THE COURT:  Thank you.

23        You may cross.

24        MR. BYRD:  Just one moment, Judge?

25        THE COURT:  Sure.

1                           CROSS EXAMINATION

2    BY MR. BYRD:

3    Q    Okay.  Agent O'Connor, the traffic stop in this case,

4    related to the offense conduct, I mean, are you saying that he

5    fled from officers?

6    A    No.

7    Q    Okay.  Because that's not in the complaint, is it?

8    A    No.

9    Q    All right.  So, you're just relying on what people said to

10   you --

11   A    Yes.

12   Q    -- about the stop?

13   A    Other law enforcement officers, yes.

14   Q    Okay.  He wasn't charged with fleeing or with reckless

15   driving or with anything like that?

16   A    No.

17   Q    And he cooperated with the Bryant Police Department when

18   he was pulled over?

19   A    Yes.

20   Q    The gun itself was not modified; the switch was separate

21   from the gun?

22   A    Correct.

23   Q    To be clear, right?

24   A    Yes.

25   Q    The gun that was recovered was a .40-caliber, the Glock

1   23?

2   A    Yes.

3   Q    You testified that the casings recovered from the area of

4   that shooting at West 36th and John Barrow were rifle casings?

5   A    Correct.

6   Q    And not .40-cal casings?

7   A    Not that I know of.

8   Q    With respect to the police reports, starting with March

9   4th, 2016, you said something about him having a stun gun --

10  or somebody having a stun gun?

11  A    Somebody.

12  Q    Okay.  Thank you.  The candid -- the candidness -- I mean,

13  would you agree that this report does not allege that he

14  specifically committed any crime?

15  A    Well, he's listed as a person in this report.

16  Q    So, I could have called up and listed him in a report, and

17  he -- knowing he wasn't even present.  I mean, that -- that's

18  possible, right?

19  A    I'm not certain how he -- how he was found to be in this

20  report.

21  Q    Okay.  But -- but, you do agree that there is no

22  allegation that he actually committed a crime in this -- in

23  this narrative?

24  A    Not from what I gather from --

25  Q    Yes or no is fine.

O'Connor - Cross                                    20

1  A   I just want to be accurate.  Well, the -- if he was a

2  suspect in this, then he would be breaking and entering, but

3  he is listed as a person on the report.

4  Q   So, you're saying that just because someone is listed as a

5  suspect in a police report, they must have committed a crime?

6  A   No, I'm just merely saying that he's listed in the report.

7  Q   Okay.  But my question to you was, does the narrative in

8  the report allege that Davyon Roberts committed a crime under

9  Arkansas law?

10 A   It's difficult to say.

11 Q   I'll go with that.  The next one is October 4th, 2016, the

12 incident that allegedly happened at school.  Oh, and by the

13 way, he wasn't charged with anything from the last one, was

14 he?

15 A   Not to my knowledge.

16 Q   Okay.  The second one, he wasn't charged with anything

17 related to this either, was he?

18 A   Not to my knowledge.

19 Q   And the -- the allegations say that he was at school and

20 -- and popped the teacher with a piece of paper from a rubber

21 band?

22 A   Yes.

23 Q   That's what it says?  Okay.

24 A   Yes.

25 Q   Okay.  Moving on to August 29th, 2017.  This is throwing

1    toilet paper rolls allegation?

2    A    Correct.

3    Q    The person who called that in refused to be identified,

4    correct?

5    A    Yes.

6    Q    And nobody identified Davyon Roberts as the one throwing

7    toilet paper?

8    A    It says they saw the listed juveniles throwing toilet

9    paper.

10   Q    Okay.  Wait a second.  So, the refused complainant advised

11   they saw the listed juveniles throwing tissue rolls into

12   traffic.  Did that person I.D., specifically, Davyon Roberts

13   in a lineup or anything like that?

14   A    Not in a lineup, to my knowledge.

15   Q    Okay.  Did that person describe Davyon Roberts with enough

16   specificity for the officer to say, "Yeah, that's Davyon

17   Roberts"?

18   A    I don't know.

19   Q    Okay.  Is it possible that some other kid threw toilet

20   paper in the -- in the street, and not Davyon Roberts?

21   A    Anything is possible, but, unlikely, I would say, if he's

22   listed.

23   Q    So, just because he's listed in a police report means he

24   committed a crime?

25   A    No, he's just listed in the police report.

1  Q   Right.  But, I'm asking you, just because he's listed in

2  the police report, does that mean that he -- he committed a

3  crime?

4  A   Well, I'm not a criminal mischief -- no, I mean, I'd --

5  I'd have to look at more.  I'm just telling you what I have

6  from -- from this police report here.

7  Q   Okay.  Well, did the complainant specifically say it was

8  Davyon Roberts who threw toilet paper?

9  A   I don't know what they specifically said.

10 Q   Because it's not listed in here, correct?

11 A   It just says the refused complainant advised they saw the

12 listed juveniles throwing toilet rolls into traffic, and he is

13 one of the listed juveniles.

14 Q   Okay.  Is it possible the refused complainant made it up?

15 A   It's possible, yes.

16 Q   Of course.  Okay.  And the -- I guess the officer arrived

17 after the fact and didn't see anything him or herself; is that

18 fair to say?

19 A   Yeah, the officer did not see that.

20 Q   Okay.  The night -- the September 13, 2017 curfew

21 violation allegation, the allegation is that he was with a

22 bunch of other kids, right?

23 A   Essentially.

24 Q   Okay.  And it looks like the first kid, Ziondrick Jones,

25 was discovered in a truck outside the apartment from where he

O'Connor - Cross                                          23

1   lives, the apartment complex where he lives?  In other words,

2   was he found in the parking lot of the -- of the complex where

3   he lived?

4   A   He was sit -- he was sitting in a truck outside the

5   apartment is what this says.

6   Q   So, in other words, he's -- he's just out in front of his

7   house basically?  I mean, we really don't know?

8   A   I don't know which apartment it is that they're talking

9   about.

10  Q   Okay.  Moving on to October 13th, 2020, there was three

11  reports.  All of them involve lots of kids, or lots of people;

12  is that fair to say?

13  A   Yes.

14  Q   So, multiple people are listed as suspects in these

15  reports, right?

16  A   At least five.

17  Q   Okay.  So, the first one does not specifically allege that

18  Davyon Roberts committed a crime, correct?

19  A   No.

20  Q   Okay.  The second one, again, has multiple suspects,

21  right?

22  A   Yes.

23  Q   Including unknown suspects?

24  A   Yes.

25  Q   And it does not specifically allege that Davyon Roberts

1  committed a crime, correct?

2  A    Not in the narrative.

3  Q    Okay.  Well, where does it allege -- does it allege

4  anywhere that he committed a crime?

5  A    He's listed as a suspect.

6  Q    Right.  Okay.  Yeah.  But in the narrative, it doesn't

7  allege specifically that he committed a crime?

8  A    Not specifically.

9  Q    The third report from that day, multiple suspects again,

10  correct?  He's listed as one of the many, right?

11  A    Yes.

12  Q    Nothing in the narrative specifically alleges that Davyon

13  Roberts committed a crime, correct?

14  A    Correct.

15  Q    Okay.  October 20, 2020, in that case, he appears to have

16  cooperated with -- with law enforcement with his mom present;

17  is that how it looks to you?

18  A    There's no indication that he wasn't cooperative.

19  Q    That he -- okay.  Okay.  So, it appears that he was

20  cooperative with them, right, but he wasn't charged -- I mean,

21  he wasn't convicted of any crime in this case, was he?

22  A    I believe -- I believe he -- subject one, charged with

23  theft by receiving, minor in possession of a handgun, and

24  possession of marijuana.

25  Q    Have you seen the bail report in this case?

1   A    I have not.

2   Q    Okay.  Would you agree -- I mean, if -- would you take my

3   word for it if I said it wasn't listed in there, or would you

4   take Ms. Eldridge's word?

5   A    (Laughter.)

6   Q    We'll leave that for argument.  That's okay.  Withdraw the

7   question.  Okay.  Moving on to February 28th, '21, this was a

8   alleged fight, you know, among females that started on social

9   media; that's what you testified to, right?

10  A    Yes.

11  Q    Lots of people are listed as suspects again, right?

12  A    There were six suspects.

13  Q    There's a video of them, right?

14  A    There is.

15  Q    But nothing in the report alleges that Davyon Roberts

16  specifically shot anyone, correct?

17  A    It did not in the incident report, but in his affidavit --

18  in Detective Henry's affidavit, I believe it says that all six

19  shot.  And Davyon was identified as one of the six.

20  Q    Do you have -- do you have that affidavit?

21  A    Yeah.

22  Q    May I see it?

23  A    You may.  You're welcome.

24  Q    Nobody in here alleges that Davyon Roberts shot the girl.

25  For starters, let's just clear that up.  Nobody alleges that

O'Connor - Cross                                        26

1  Davyon Roberts shot the girl, correct?

2  A   That's correct.

3  Q   Okay.  Okay.  It's a long report.  I mean, it's multiple

4  pages.

5         MR. BYRD:  Just one moment, Your Honor?

6         THE COURT:  Sure.  Take your time.

7         MR. BYRD:  May I ask the prosecutor a question,

8  Judge?

9         THE COURT:  Sure.

10     (Mr. Byrd confers with Ms. Eldridge, off the record.)

11        MR. BYRD:  May I approach the witness?

12        THE COURT:  You may.

13 BY MR. BYRD:

14 Q   And can you tell me specifically, Agent O'Connor, where it

15 says -- I mean, we've cleared up -- we've cleared it up that

16 he didn't shoot the young lady.

17 A   Uh-huh.

18 Q   Where does it say that he actually fired -- that he was

19 specifically identified as -- as discharging a gun?

20 A   On page 3, at the bottom, the last sentence.  Here, I've

21 got another one in front of me.  Page 3, the last sentence:

22            "The other five suspects began to

23            fire into the crowd and into the

24            air."

25     So, in that paragraph -- or they had already described the

1    one individual shooting Ms. Tucker-Williams in the leg, so

2    that would leave the other five shooting into the crowd and

3    into the air.  And then, further along in the affidavit,

4    several people identified Davyon as one of those of

5    individuals.

6    Q    So, I mean, did they specify what he did; did he fire into

7    the air or fire into the crowd?

8    A    That's not specific.

9    Q    And did they specifically identify that he -- I mean, did

10   anyone say, "Hey, Davyon Roberts shot a gun at that place"?

11   A    A lot of people saw a bulletin where they were -- they

12   were -- Little Rock was trying to locate, trying -- trying to

13   identify, and there were several people, I believe including

14   the victim, Ms. Tucker-Williams, who identified Davyon as one

15   -- one of those individuals.

16   Q    Where specifically is that in the narrative?  Where is

17   that in the narrative?

18   A    Let me find it.

19           MR. BYRD:  And I apologize, Your Honor, it's a ten

20   page narrative that --

21           THE COURT:  I understand.

22           MR. BYRD:  -- I hadn't seen it until now.

23           THE COURT:  Take your time.

24           THE WITNESS:  On page 4.  Here, I'll give you that

25   one.  On page 4, in that first paragraph, Little Rock

1  detectives went to Ms. Tucker-Williams, the victim, to -- for

2  another recorded statement.  Ms. Williams said she knew all

3  the suspects in the flyer she saw on Facebook that was posted

4  by Little Rock Police Department.  Ms. Tucker-Williams said

5  she knew the larger subject, wearing the gray t-shirt and

6  black jacket, as Davyon.

7  Q    Okay.  Now, Ms. Tucker-Williams, I guess, was there to get

8  into a fight with some other girl?

9  A    I don't know if Ms. Tucker-Williams specifically, but I

10 knew the crowd was gathered there for a fight between females.

11 Q    Okay.  But, as far as the veracity of the information

12 relied on to identify Davyon Roberts, they're going off other

13 people who responded to a BOLO?

14 A    Yes.  Witnesses, and also a Little Rock SID detective also

15 identified Davyon as one of the individuals too.

16 Q    How did he do that?

17 A    I don't know.  I believe the sentence just says that a SID

18 detective, Special Investigations Division detective

19 identified him.

20 Q    So, he had -- so, not another person, but -- but a

21 detective identified him?

22 A    A detective, yeah.  Let me find it.

23 Q    Where?

24 A    Okay.

25 Q    While you're looking for that though --

1  A    Uh-huh.

2  Q    -- he was never arrested or caught with a firearm related

3  to this offense, was he?

4  A    I don't know.  I believe he was arrested with a firearm

5  after this though.

6  Q    You believe?  Where does it say that?

7  A    It says that on -- okay, to the first question, the SID

8  detective, that's page 3, in the second to last paragraph.

9  Here.

10 Q    The highlighted portion?

11 A    Yes.

12 Q    All it says is that SID Detective Paul Denke (phonetic)

13 stated the larger male was Davyon Roberts?

14 A    Yes.  Identifying him.  That -- to me, that's identifying

15 him.

16 Q    Okay.  But we don't know how he identified him.  I mean,

17 he doesn't know Davyon Roberts, does he?

18 A    I don't know about personally.  Okay.  Okay.  So, on page

19 5, in the third paragraph:

20                "Little Rock officers responded to

21                the 4100 block of West 24th Street

22                for a ShotSpotter activation that

23                captured nine rounds.  While

24                officers were there, a white Dodge

25                Avenger arrived on scene, being

1                       driven by Davyon Roberts, whose

2                       name has been brought up as a

3                       suspect in the shooting incident.

4                       Officers identified the front seat

5                       passenger as Keaton McGee, whose

6                       name has also come up in the

7                       shooting incident, and the rear

8                       passenger as Jacarius (phonetic)

9                       Kelly.  Officers observed a Draco

10                      AK-47 on the passenger floorboard

11                      under Mr. McGee's feet.  Patrol

12                      officers removed all subjects from

13                      the vehicle and secured the

14                      weapons.  There were three

15                      firearms located inside the

16                      vehicle, which included a

17                      9-millimeter handgun, a .223

18                      caliber rifle, and 7.62 caliber

19                      rifle."

20    Q    Thank you.

21    A    You're welcome.

22    Q    The last allegation, from July 25th, '21, Dillon Holmes

23    allegedly said that my client was carrying a gun after -- at

24    the -- I'm sorry, let me -- let me review the narrative real

25    quick.

1    A    Okay.  It should be the last sentence.

2    Q    So, how do we know he's not -- how do we know he's telling

3    the truth?  I mean, how do we know what really happened?

4    A    I don't know.

5    Q    Okay.  Is it possible this guy from across the street shot

6    at them?

7    A    It's possible.  It appears from the report that both

8    residences were hit, so like they were shooting at each other.

9    Q    But, at the end of the day, we don't know if -- if this

10   happened the way it went down, it's possible that Mr. Holmes

11   was the individual who fired rounds that night?  I mean, it --

12   it doesn't -- there was no photo line -- there was no photo

13   I.D. lineup or anything like that, related to -- to the

14   incident, specifically describing Davyon Roberts?

15   A    Yeah, not that I'm aware of.

16           MR. BYRD:  May I have a second, Your Honor?

17           THE COURT:  Sure.

18   BY MR. BYRD:

19   Q    One last question about July 25th.

20   A    Yes, sir.

21   Q    Was there another witness, a neighbor, who reported that

22   this Mr. Denton initiated -- was the primary aggressor in

23   shooting at -- across the street?

24   A    Not that I can see in the report.

25   Q    But, Mr. Denton himself didn't identify Davyon Roberts,

1  did he?

2  A    This report says:

3                    "Mr. Denton stated he exited his

4                    residence with his rifle and

5                    engaged a black male who was in

6                    the driveway at 7 Lark Place."

7  Q    Was --

8  A    Mr. --

9  Q    Yeah.

10 A    Yeah.  Mr. Denton didn't specifically name Mr. Roberts.

11 Q    But he says -- I mean, he clearly had to have seen the

12 black male, but it doesn't say that he later formally I.D.'d

13 Davyon Roberts?

14 A    Not in this report.

15 Q    Okay.

16 A    Not to my knowledge.

17          MR. BYRD:  I'll pass the witness, Judge.

18          THE COURT:  Thank you.

19          Any redirect?

20          MS. ELDRIDGE:  I have no further questions for this

21 witness, Your Honor.  The Government rests.

22          THE COURT:  Okay.  Thank you.  You may stand down.

23          THE WITNESS:  Thank you, Your Honor.

24      (Witness steps down.)

25          THE COURT:  Mr. Byrd?

Jones - Direct                                        33

1          MR. BYRD:  Yes, ma'am.

2          THE COURT:  Do you have any testimony?

3          MR. BYRD:  One witness, Your Honor.  That's LaQuanna

4   Jones.

5          THE COURT:  Please come forward, Ms. Jones.

6          MR. BYRD:  Oh, she's in the bathroom.

7          THE COURT:  Oh.  We'll just --

8          MR. BYRD:  Thank you.  Sorry, Your Honor.

9          THE COURT:  That's okay.

10          MR. BYRD:  She's here.

11          THE COURT:  Ms. Jones, please come forward and face

12   my Courtroom Deputy to be sworn.

13      (LaQUANNA JONES, DEFENDANT'S WITNESS, SWORN.)

14          THE COURT:  Okay.

15                       DIRECT EXAMINATION

16   BY MR. BYRD:

17   Q    Please state your name.

18   A    LaQuanna Jones.  LaQuanna Jones.

19   Q    Okay.  What's your address?

20   A    33 Nandina Circle, Apartment 6.

21   Q    In Little Rock?

22   A    Yes.

23   Q    And we've spoken previously about you coming to testify

24   and serve as a third party custodian for your son, right?

25   A    Yes.

1   Q   And just to be clear, Davyon is your son?

2   A   Yes, he is.

3   Q   And you've known him all his life, obviously.  He's 18?

4   A   Yes.

5   Q   Is that right?  And he's in school at Metro?

6   A   Yes.

7   Q   And he's in 12th grade?

8   A   Yes.

9   Q   And he's -- he's -- well, if he's -- if he's released,

10  he'll go back to school Monday?

11  A   Right.  Well, on the 5th -- after the 5th.

12  Q   Oh, on the 5th.  Okay.  On Wednesday?

13  A   Uh-huh.

14  Q   Okay.  Okay.  So, you -- where do you work?

15  A   UAMS.

16  Q   And what do you do at UAMS?

17  A   Housekeeping.

18  Q   What are your hours?

19  A   3:00 p.m. to 11:30.

20  Q   Monday through Friday?

21  A   Yes.

22  Q   Now, if -- if you're -- when you're working -- who else

23  lives at the house?

24  A   My daughter.

25  Q   And her name is?

Jones - Direct                                    35

1   A    Kyanna Stevenson.

2   Q    And she's here today?

3   A    Yes.

4   Q    Okay.  How old is Kyanna?

5   A    26.

6   Q    And she has a child?

7   A    Yes.

8   Q    And Kyanna is fine with Davyon coming home?

9   A    Yes.

10  Q    So when -- when you go into work, is she home?

11  A    Yes.

12  Q    Okay.  When he got arrested, he was staying -- on December

13  20th, he was staying with a friend; is that right?

14  A    I guess he was visiting a friend.  But I wouldn't say he

15  was staying there.

16  Q    Okay.  Okay.  But he wasn't -- he wasn't -- I mean, he was

17  there in Bryant --

18  A    Uh-huh.

19  Q    -- with a friend?

20  A    Uh-huh.

21  Q    Okay.  And by the way, this is in a public housing

22  complex?

23  A    Yes, it's a --

24  Q    I mean, is it -- but, I mean, is your landlord okay with

25  him coming home to stay with you if he's under supervision, as

1  far as you know?

2  A   As far as I know.  He's on my lease, so.

3  Q   Oh, okay.  Okay.  And you have two bedrooms?

4  A   Uh-huh.

5  Q   He'll have his own room?

6  A   Yes, he does.

7  Q   I mean, it's his bedroom he's always had?

8  A   Yeah, he has his own room.

9  Q   Okay.  Do you have any animals -- vicious animals or

10 anything like that?

11 A   Oh, no.

12 Q   All right.  Do you have a cell phone?

13 A   Yes.

14 Q   Do you have Internet -- Internet access?

15 A   Yes.

16 Q   You don't have -- you have some prescription drugs, but

17 none of them are narcotics or anything, right?

18 A   No.

19 Q   So, you have medications for diabetes and high blood

20 pressure?

21 A   I do.

22 Q   And for cholesterol?

23 A   Yes.

24 Q   Okay.  Are there any guns in the house?

25 A   No.

Jones - Direct                                          37

1   Q   And your -- I'm sorry, your daughter, Kyanna, doesn't have

2   any felony conviction?

3   A   No.

4   Q   Okay.  Let's go on to your criminal history.  Okay.  Back

5   in -- well, you were very candid I think with us about your --

6   at least about the convictions from the past.  Let's just go

7   through them really quickly.  You had a misdemeanor theft of

8   property in 1997?

9   A   Yes.

10  Q   How old were you, roughly, then?  It's always really hard

11  for me to --

12  A   About 19.

13  Q   About 19.  Okay.

14  A   I'd say about 19.  Uh-huh.

15  Q   And a couple of weeks later, I think you said it was a

16  failure to appear misdemeanor?  And then -- does that sound

17  familiar?

18  A   Yes.

19  Q   And then, there was a, quote, "impersonation" misdemeanor.

20  Was that related to getting into a car accident and giving the

21  police a wrong -- the wrong name?

22  A   Yes.

23  Q   Okay.  You weren't actually impersonating another person,

24  you just gave them a wrong name?

25  A   My sister's name.

1   Q   You gave your sister's name.   Okay.   And did you comply

2   with all of the -- and then there was a contributing to the

3   delinquency of a minor arrest -- I'm sorry -- conviction from

4   2000.   Do you remember that one?   If you don't, it's okay,

5   it's a long time ago.

6   A   I don't remember.

7   Q   Okay.   For the ones that you remember, do you remember

8   complying with all that you were supposed to do, and probably

9   -- you probably paid fines and had probation and stuff like

10  that?

11  A   I -- I got through all that, yes.

12  Q   Okay.   Well, later on in 2014, August, you got charged

13  with a misdemeanor domestic battery; do you remember that?

14  A   Yes.

15  Q   And that involved a Lawrence Stewart?

16  A   Yes.

17  Q   And then there was another lady mentioned, but I don't --

18  in what I saw, but you don't recall any other lady?

19  A   I don't know who that is.

20  Q   Lawrence Stewart, what was he -- what -- just tell the

21  judge what happened in that situation.

22  A   Well, he had been drinking and he charged at my daughter,

23  so I got a knife and I cut him, and we both went to jail.

24  Q   And ultimately, your charge was dropped?

25  A   Uh-huh.   Yes.

1  Q   So, they -- they decided to drop your -- your charge?

2  A   Yes.

3  Q   We talked about this before, it shows an arrest later for

4  domestic battery first degree, but you don't remember that?

5  A   I don't have -- no, that's the only --

6  Q   It's probably all the same thing.  I -- okay.  I'll leave

7  that to argue in front of judge.

8  A   I don't know.

9  Q   But, you -- all you remember is the one domestic battery

10  arrest from seven years ago?

11  A   Yes.

12  Q   Okay.  And you have a protection order, protecting you

13  from a person named Lionel Green.

14  A   Yes.

15  Q   Who is that?

16  A   A ex-boyfriend.

17  Q   When is the last time you saw him?

18  A   The night he ran me over.

19  Q   That was -- but what year was that?

20  A   2016.

21  Q   Okay.  So you haven't seen him in five years.  Thank you

22  for being candid about this.  I know it's not easy to talk

23  about it and it's not easy to be here under these

24  circumstances.

25      Do you understand generally what Davyon is charged with?

                          Jones - Direct                        40

1   A    I do.

2   Q    But he hasn't -- he hasn't talked to you about the

3   charges, has he?

4   A    No.

5   Q    Well, if the Court is willing to release Davyon under

6   conditions of supervision, you understand that if -- if you

7   are the third party custodian, it is your duty, clear -- I

8   mean, without any reservations, to call in a report if he

9   violates his conditions; do you understand that?

10  A    I understand.

11  Q    In other words, you're going to call in a violation to the

12  Pretrial Office even if it means he'll get arrested?

13  A    Yes, I understand.

14  Q    So, let's -- let's talk just real candidly about what I

15  think is going to be the line of questioning that's going to

16  come at you here in a few minutes.  Okay?  Davyon -- and

17  you're not -- I mean, Davyon has been out in the streets

18  messing with other kids, I mean, there's -- there's -- there's

19  -- that's true, right?

20  A    Yes.

21  Q    And you're a single mom?

22  A    I am.

23  Q    And you're raising -- you've raised three kids?

24  A    Yes.

25  Q    Two of who live with you, including Davyon?

1  A    Uh-huh.

2  Q    And you have a granddaughter -- a grandbaby?

3  A    Uh-huh.

4  Q    And another one on the way?

5  A    Yes.

6  Q    And you work full time?

7  A    Yes.

8  Q    So, you're doing everything you can?

9  A    Yes.

10 Q    So, when you're gone, it's not like you can, you know,

11 supervise him --

12 A    Right.

13 Q    -- as well as you would like to?

14 A    Right.

15 Q    Now we talked about, and you agreed, that if the judge

16 releases Davyon to you, your -- you think it's very -- a great

17 idea for him to be placed on electronic monitoring?

18 A    I do.  I agree.  Yes.

19 Q    And you understand that if -- if the Court is willing to

20 do that, that the U.S. Probation and Pretrial Office will put

21 a receiver in your home, and that will communicate with his

22 ankle monitor?

23 A    Uh-huh.

24 Q    And you're fine with that?

25 A    Yes.

1  Q   Are you wanting to see your son graduate from high school?

2  A   I do.

3  Q   The -- some of the problems -- I mean, some of the, you

4  know, arrests and things that have happened in the past here,

5  notwithstanding, when he's in your home, does he listen to

6  you?

7  A   Yes.

8  Q   He never -- does he ever say to you, "Forget you, I'm

9  going to do what I want"?

10 A   He don't disrespect his momma at all.

11 Q   It's just simply you're not there, you know, sometimes,

12 and then he'll go do whatever he's -- whatever he's up to?

13 A   Yes.

14 Q   Do you think that he's running around with some bad kids?

15 A   I do.

16 Q   Let's talk about one -- one other thing.  You made a

17 police report on the 26th of December related to a woman who

18 was making threats or something like that, right?

19 A   Yes.

20 Q   Can you tell the judge what that was about?

21 A   Well, it's my cousin's baby mother.  I don't -- yeah, but

22 she threatened my mom and dad, and she thinks that my son had

23 something to do with her son's death, so she went to my mom

24 and dad's house and threatened them.  She sent text messages

25 to my cousin, and he just forwarded them to me, so I just

Jones - Direct/Cross                                    43

1   thought I should report it, everything that she's doing, you

2   know, be --

3   Q   Okay.  But you're not -- I mean, you're -- obviously, you

4   took this seriously?

5   A   Uh-huh.

6   Q   But you're not -- you're not, you know, afraid that this

7   woman is going to come down here or anything like that?

8   A    No.  From what I was told, that she was under the

9   influence at the time.  But, still, I needed to -- we needed

10  to report it.

11  Q   Okay.  Well, that was responsible of you.

12  A   Uh-huh.

13          MR. BYRD:  May I have a second, Your Honor?

14          THE COURT:  Certainly.

15          MR. BYRD:  I'll pass the witness.

16          THE COURT:  Thank you.

17          You may cross.

18                      CROSS EXAMINATION

19  BY MS. ELDRIDGE:

20  Q   Hi, Ms. Jones.

21  A   How you doing?

22  Q   I just have a few questions for you.

23  A   Okay.

24  Q   Has your son lived with you his whole life?

25  A   Yes.

Jones - Cross                                                44

1   Q    Okay.  And would you agree with me that he started getting

2   into trouble at a pretty young age?

3   A    Yes.

4   Q    Okay.  And did you ever have any rules about his behavior

5   outside the home?

6   A    Yes, I tried, you know.

7   Q    And what -- I mean, what would you -- what were your rules

8   about his behavior outside the home?

9   A    You know, just -- basically just respect others and try

10  not to get into any trouble, you know.  I always told them,

11  you know, every action has consequences, because that's how I

12  was raised.  But, I don't know, it just -- the influences

13  outside the home, that's --

14  Q    Will you agree with me that his behavior outside the home

15  is difficult to control?

16  A    No, not really.

17  Q    Why not?

18  A    I mean, because he has like -- he has -- he do therapy,

19  and he has people he can call, you know.

20  Q    Now, when he -- when he did have issues, like, for

21  instance, this issue at school, out past curfew, were there

22  consequences from your end on him?

23  A    Yes.  Yes.  You know, he got privileges taken away.

24  Q    What kind of privileges?

25  A    Like his game system, his phone.

1  Q   Anything else?

2  A   Not -- not visiting friends, you know.

3  Q   Okay.  And when he started picking up charges relating to

4  firearms, were there any additional consequences or punishment

5  taken out on him?

6  A   Just I don't -- he just -- he have to stay in the house,

7  or, you know, I could try to keep him in the house, you know.

8  Q   To the extent that you could keep him in the house, you

9  tried?

10 A   Yeah, because I have to work, you know.

11 Q   When he got in trouble in July, on the terroristic act --

12 and you've been in here most of the time, right?

13 A   Uh-huh.

14 Q   And you heard us talking about that.  Did somebody bond

15 him out of jail on those charges?

16 A   Yes, I did.

17 Q   You did?  And how much was that bond?

18 A   I don't --

19 Q   Does 25,000 dollars sound about right?

20 A   Yes.  Yeah.

21 Q   Okay.  And do you remember how soon after this -- he was

22 arrested on that, you bonded him out?

23 A   And you say this is the July one?

24 Q   July.

25 A   The next -- no, the same -- was it the -- it was the next

1   day.

2   Q    Okay.

3   A    Uh-huh.

4   Q    Have you bailed him out on any other charges that he had?

5   A    I have, yes.

6   Q    Which ones were those?

7   A    It was the one before that one, before that incident.

8   Q    The aggravated assault?

9   A    Yes.

10  Q    Okay.  And what was the bond on that?

11  A    I think it was fifteen.

12  Q    Okay.  So, he's kind of been a bit of a financial burden

13  on you this year, right?

14  A    Not just me, I had help.

15  Q    Okay.  Now, with respect to the police report that you

16  mentioned, you -- you made that complaint on December 26th,

17  right?

18  A    Yes.

19  Q    And did that incident -- were those threats made on

20  December 26th or sometime before that?

21  A    It was Christmas Eve, December --

22  Q    Christmas Eve?

23  A    Well, the -- the December 26th, yes, that's the text

24  messages, but the threats, they came to my mom and dad's

25  house, was on the 24th.

1   Q   And what -- I mean, what was the nature of those threats?

2   A   That she want to do something to my son.

3   Q   And why -- why did she want to do something to your son?

4   A   Because she thought -- she thinks that he had involvement

5   in her son getting killed.

6   Q   And who was her son that got killed?

7   A   I don't know his name.

8   Q   You don't know his name?

9   A   Uh-uh.

10  Q   Do you know when he was killed?

11  A   In November, I think it -- yeah, November.

12  Q   Does Xavier Johnson sound --

13  A   Uh-huh.

14  Q   -- like it would be a right name?

15  A   Yeah.

16  Q   Okay.  Is that a name that's familiar to you now that I

17  say that?

18  A   Yeah.

19  Q   Okay.  So, basically, his family is making threats to your

20  family because they think your son was involved in his murder?

21  A   His mom is, yeah.

22  Q   Okay.  Now, if he gets released, Ms. Jones, I mean, do you

23  really think that he can stay away from trouble?

24  A   I think he could if he's in the house.  If he's in the

25  house and I left to go anywhere, yeah.

Jones - Cross                                              48

1   Q    But, he's -- he's not been allowed to go places before,

2   and he's been able to get out and cause trouble, right?

3   A    He have.

4   Q    So, would you agree with me that you think it -- it could

5   be a challenge to keep him out of trouble again?

6   A    I don't think it will.  Not if he's at home.  If he's at

7   home, he won't be in no trouble.

8   Q    You think he can stay away from the people that have been

9   influencing him --

10  A    Oh, yes.

11  Q    -- for this long?

12  A    Uh-huh.  He's not going to have a choice.

13  Q    And why is that?

14  A    Because he's going to understand what -- what it is that's

15  going on right now today.  And he had time to sit down here

16  and think about it this time.  Wasn't no bonding out, getting

17  out, you know, during it.  He had time to sit down and think.

18  Q    Well --

19  A    And he have to have learned -- realized that there's

20  consequences.  I'm putting myself at risk here.  You know what

21  I'm saying?

22  Q    Well, you've already put your money on the line for him in

23  previous incidents.  What makes this --

24  A    Money --

25  Q    -- different?

1  A    Money, I can make.  But I'm not going to give up my life,

2  you know, like that, just like that, because you out here

3  making dumb decisions.  No, he's not fixing to do that.  We're

4  not fixing to do that.

5            MS. ELDRIDGE:  That's all I have, Your Honor.

6            THE COURT:  Thank you.

7            Mr. Byrd?

8            MR. BYRD:  No further questions.

9            THE COURT:  Thank you.  You may stand down.

10           THE WITNESS:  Yes, ma'am.

11       (Witness steps down.)

12           THE COURT:  Any additional witnesses?

13           MR. BYRD:  No, Your Honor.  Defense rests.

14           THE COURT:  I'll hear argument starting with you, Ms.

15  Eldridge.

16           MS. ELDRIDGE:  Your Honor, the Court must find by

17  clear and convincing evidence that this defendant is a danger

18  to the community in order to keep him detained.  I am making

19  an argument on that factor under 3142.  Your Honor, I -- I

20  don't believe that this defendant is just a danger to the

21  community, I believe he's a significant danger to the

22  community.  And I do believe that the Government has met its

23  burden of proving that by clear and convincing evidence.

24           The nature of this charge is that the defendant had a

25  conversion device that he could have affixed to a firearm in

1  order to make it capable of shooting automatically with a

2  single pull of the trigger.  That conversion device was found

3  on his person during a pat down.  A gun was located under the

4  driver's seat, that did not have a back plate on it.

5         I believe that those circumstances show that either

6  this defendant was prepared to place that conversion device on

7  that gun, or that it had just recently been on that gun before

8  law enforcement made contact with him.

9         This individual is 18 years old.  There is no reason

10  that he needs a conversion switch on a firearm, much less a

11  firearm in general.

12         I do believe the evidence in this case is strong.

13  This was a traffic stop and the conversion device fell out of

14  his pocket.  No, it was not affixed to the gun, but that is

15  not a part of the element of the charge.  The fact that he had

16  the conversion device capable of making a firearm shoot

17  automatically with one pull of the trigger is enough.

18         The history and characteristics of this defendant,

19  Your Honor, are particularly disturbing given his young age.

20  He started showing up in LRPD reports at the age of 12.

21  Admittedly, he's not charged in several of those reports.

22  But, the fact that his name continues to come up in

23  increasingly violent instances, from the age of 12 up until

24  now the age of 18, is huge.  Every report or charge that he is

25  mentioned in since the age of 15 involved a firearm.

1          And at the time of this offense, this defendant had

2    bonded out on a 25,000 dollar bond on the terroristic act

3    that's pending in circuit court right now.  And I believe that

4    he had also made some type of bond on the aggravated assault

5    charge that he incurred in February.

6          Together, with this charge from December 20th of

7    2021, that's three firearm related charges; two of which

8    involve shootings.

9          Now, I believe that the Government has overwhelmingly

10   met its burden on these factors alone; however, I haven't even

11   brought up the fact that the reason we're here today is

12   because of a double homicide that was committed on December

13   19th of this year.

14         THE COURT:  And I -- and just to be clear, there is

15   no -- I have not heard any evidence suggesting, even

16   circumstantially, that he was involved in the crime leading to

17   the two deceased individuals being thrown at Baptist Hospital

18   on or about December --

19         MS. ELDRIDGE:  19th.

20         THE COURT:  -- 19th.  Is that correct?

21         MS. ELDRIDGE:  That's absolutely correct, Your Honor.

22         THE COURT:  Okay.

23         MS. ELDRIDGE:  I just want to bring that up because

24   this defendant was located in the suspect vehicle that has

25   been identified as -- the vehicle that he was located in on

1  December 20th has been identified as the suspect vehicle from

2  the December 19th shooting.  I'm not saying that he was in

3  that shooting on December 19th.  However, the very next day --

4           THE COURT:  I mean, you bring that up, and, you know,

5  Mr. O'Connor did testify about it, and I -- the language in

6  the complaint, it just says a -- a vehicle -- a suspect

7  vehicle was observed, and it doesn't say what connection, if

8  any, it had.  I mean, it could just be somebody driving by

9  around the time the -- the vehicle was observed, from what's

10  in the complaint.

11           MS. ELDRIDGE:  Correct.

12           THE COURT:  And from what I heard on the stand.

13           MS. ELDRIDGE:  Correct.  And the Court is absolutely

14  -- absolutely right.  I -- I simply wanted to make sure that

15  that -- I didn't want to draw a connection between the two

16  incidents; however, the reason that law enforcement was

17  looking for the blue Crown Victoria is because of something

18  that occurred the day before, and something very serious that

19  had occurred the day before.

20           THE COURT:  Fair enough.

21           MS. ELDRIDGE:  Your Honor, I don't believe that the

22  third party custodian is an appropriate release plan for this

23  defendant.  I think that it is -- it is very obvious that this

24  defendant cannot be controlled or managed by even his own

25  mother.  That has been evident for several years now.

1    Your Honor, there's no set of conditions that will

2    reasonably assure the safety of the community from this

3    defendant.  Absolutely none.  And for that reason, I would ask

4    this Court to detain him.

5    THE COURT:  Thank you, Ms. Eldridge.

6    MS. ELDRIDGE:  Thank you.

7    THE COURT:  Mr. Byrd?

8    MR. BYRD:  Your Honor, it's our position that it's

9    messy.  And of course it is, it's -- there's a lot going on

10   with him.  But we don't -- I don't think the Government has

11   met its burden to prove by clear and convincing evidence he's

12   a danger to the community.

13   And there are -- there is a set of conditions that

14   will reasonably assure -- not guarantee, that's not the

15   standard -- reasonably assure the safety of the community.

16   So, we're asking the Court to release him to home detention

17   with location monitoring.  And home detention with location

18   monitoring means that he will be tracked.  If he leaves the

19   residence, U.S. Pretrial is notified immediately.  They always

20   move swiftly.

21   And another thing is that he's -- I mean, he is -- he

22   is young.  Okay?  That cuts both ways, I think.  You know,

23   young people have, you know, impulse control and stuff like

24   that, and decision making is poor, it can be.  On the other

25   hand, he has no felony convictions.  He's never been

1  convicted, as I -- from what I can see, with a violent crime.

2          The two most -- I guess if I'm sitting in your chair,

3  the two most serious allegations that I would look at would be

4  the -- the -- you know, this -- this whatever happened in July

5  at -- on Lark, and what happened -- what is alleged to have

6  happened back in February.  What we do know is that -- with

7  respect to the July incident, is that the -- the -- the

8  neighbor across the street didn't identify my client

9  specifically.  The person who was alleged to be with my client

10  said he had a gun, walking away with a gun or something like

11  that.  So, no -- no good I.D. there, other than his partner

12  saying that he was walking away with a gun after the fact.

13  For all we know, it was his friend who -- who decided to

14  shoot, if he did at all.

15          And then, with respect to March, I guess there's --

16  the -- you know, the allegation is that he -- he may have

17  fired a -- a gun, you know, at that -- in that situation.

18  But, it's clear that he didn't shoot the -- shoot the -- the

19  juvenile female.  But, who knows really what happened in that

20  situation.

21          Obviously, those are -- those are, you know, serious

22  allegations.  The first, the March -- or the February case is

23  in juvenile court.  And the July case is in adult court.

24  Those cases are pending.

25          And so, I -- I think that there are conditions that

1  will reasonably assure the safety of the community here.

2          Ms. Jones was very candid about not -- being a single

3  mom and all the struggles that -- you know, all the -- how

4  difficult it is to be there when there's no other, you know,

5  supervisor, no other parent.  And so, that's where location

6  monitoring comes into play.

7          He needs to finish high school.  And that's a --

8  that's a characteristic that I think is a very important

9  mitigator.  He needs to finish high school.  Ninety percent of

10 the presentence reports I read in this courthouse involve

11 people who don't finish high school.  It is a huge red flag

12 for a -- a bad path.  Okay.  So, I think it's extremely

13 important.  I think he deserves a chance.

14         Sister is 24 years old -- 26?  26.  And is home all

15 day.  When mom is at work, sister is around with her child,

16 and the location monitor would be in place.  He'd have an

17 exception to go to school at Metro.  And I presume, very

18 easily, Pretrial can establish a relationship with the

19 resource officers at Metro to make sure that he's there.

20         So, with respect to the -- this -- this -- the blue

21 car, there's really no evidence that it's the same car.  I

22 mean, even assuming it was, there's no evidence that he was

23 involved in that homicide event.  And I appreciate the Court

24 for pointing that out.  If there were, I'm sure it would have

25 -- it would have come up.  I mean, of course, it would have.

1          And I think that Ms. Jones being very candid with you

2    about how -- the difficulties in the past is -- is -- shows

3    her honesty and shows that she -- and she testified that she

4    would not hesitate for a second to call in a violation.

5          The defendant's conduct, of course, is he was pulled

6    over and cooperated and -- and there was no, you know, no

7    drama or violence related to that.  I -- I understand the --

8    you know, the possession of the Glock switch and the

9    conversion issues, that will all play out later.  But, he --

10   you know, the offense conduct itself does not contain any

11   violence.  Mere gun possession is not evidence of violence in

12   the case law.

13         And when we're talking about a danger to the

14   community, you know, the danger has to be specific.  It can't

15   just be -- it just can't, in theory, be a danger.  That's --

16   that's the standard on danger in the case law.

17         And now, I -- granted, I understand the Government's

18   theories that he's, you know -- the Government is saying that

19   he is an actual danger to the community, but, you know, it's

20   just -- it really kind of boils down to those two allegations

21   earlier this year that involve allegations of -- I mean,

22   minors shooting a gun in the air is not technically a violent

23   act.  It's alarming.  Don't get me wrong.  But, and then we

24   don't really know what happened in July.  Other than that,

25   there's really no evidence he's ever been violent in this

1  record.

2          So, I -- I understand -- but, in all of the scraps

3  and things and being mentioned in police reports, I think

4  I've, you know, at least demonstrated that there was no proof

5  that he actually committed a lot of those crimes.

6          In the one case that he, you know, got caught with a

7  stolen gun, he cooperated with them.  And his mom was present

8  when he was cooperating with them.  So that shows her and

9  Davyon taking responsibility in that case.

10          At the end of the day, I think that this might be a

11  close call for you, but I think with the release plan for home

12  detention and location monitoring, and whatever else -- I

13  mean, or even home incarceration.

14          Does home incarceration allow to go to school?

15          THE PRETRIAL SERVICES OFFICER:  I believe home

16  detention would work better.

17          MR. BYRD:  Home detention would work better.  I think

18  that that reasonably assures the safety of the community.

19          But, alternatively, Judge, if you are leaning towards

20  or deciding to detain, I would ask the Court, as an

21  alternative request, to leave the record open, and so that we

22  could investigate whether there may be another family member

23  somewhere else who would agree to serve as a custodian for

24  him.

25          THE COURT:  Thank you, Mr. Byrd.

1          In our federal system -- I always start out these
2   hearings with the thought that liberty is the norm and
3   detention is the exception.  And I understand the Government's
4   argument is that they want Mr. Roberts detained as a danger to
5   the community, and the burden is on them to prove by clear and
6   convincing evidence that there are no conditions or set of
7   conditions I can impose that will reasonably assure the safety
8   of the community, not guarantee it -- if I had to guarantee
9   it, I'd never be able to let anybody out -- but that will
10  reasonably assure the safety of the community.
11          And based upon the evidence in its entirety, while
12  it's a close call, I find that I can set conditions of release
13  for Mr. Roberts that I believe will reasonably assure safety
14  of the community.
15          Mr. Byrd, you pointed out the most troubling
16  incidents are the pending charges from February and July.  The
17  -- the February incident, the aggravated assault that's
18  pending in juvenile court, I -- he -- he was not identified as
19  shooting -- I mean, there's no -- unquestionably, he didn't
20  shoot at the juvenile victim.  Somebody else did that.  But he
21  was with a group of other boys and seen on video surveillance
22  and, you know, he may have shot his gun at a crowd, would be
23  the most lenient view of it.  He may have shot it.  He shot
24  his gun.  He didn't hit anybody, thankfully.
25          You've got a July 25th incident.  It's hard to know

1   what to make of that.  It's -- it's possible somebody was

2   shooting at him; it's possible he was shooting at someone

3   else.  Again, luckily, no one was hurt.  I don't really know

4   -- it's always really difficult to make findings based on

5   police reports and pending and unresolved charges.  But, it

6   does concern me.  I mean, where there's smoke, there's usually

7   some fire.

8           So I am concerned that you're -- you're not running

9   with a good crowd, and continuing to have weapons.  I mean,

10  I'm giving you one chance, and if there is any -- if you mess

11  up at all, I will not hesitate to revoke your bond and lock

12  you up.  Do you understand that?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  He is -- I mean, he's an 18 year old,

15  still in high school.  He needs to finish high school.

16          And thus far, you haven't missed any school, have

17  you?

18          MR. BYRD:  Not to our -- not to my knowledge.

19          THE COURT:  All right.

20          MR. BYRD:  No, Your Honor.

21          THE COURT:  I find that his -- his mother, Ms. Jones,

22  is a -- is a -- she made a very credible witness.  I think she

23  was very forthcoming.  And I think she'll do her best to be a

24  third party custodian.  I'm going to help her with that by

25  imposing conditions of home detention with electronic

60

1    monitoring.  He'll be allowed to go to school.  And then, at

2    some point, if he wants to get a job, you can do that.  You

3    can go to therapy.  You can meet with your attorney.  The

4    Pretrial Services Office officer will tell you what things

5    you're authorized to leave the house to do.

6            That will be my ruling.

7            Mr. Roberts, I am going to review the charges with

8    you now -- I mean, the conditions, the bond conditions.

9    You're going to get a copy of these papers, but before you

10   leave here today I want to make sure that you understand what

11   I'm asking of you.

12           And, Ms. Jones, I would like you to come forward and

13   listen to these conditions as I review them with your son.

14           MS. JONES:  Can my daughter come up too?

15           THE COURT:  Yes.

16           Mr. Roberts, you must not commit any offense in

17   violation of federal, state, or local law while you are on

18   this bond.  You must immediately advise your Pretrial Services

19   Officer if you have any contact of any kind with a state or

20   federal law enforcement officer, even contact as minor as

21   receiving a traffic violation needs to be reported.  It's not

22   that you'll be revoked for that, we just need to know about

23   any contact.

24           And I should probably say this now, I know you've had

25   some contact with the state system, but the federal system is

1  a little different, and I -- I promise you we're very serious

2  about all our conditions, and if you fail to comply with them,

3  you'll be back before me, and it's not likely to be good.  You

4  understand that?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  You must immediately advise the Court or

7  the Pretrial Services Officer in writing of any change in your

8  address or telephone number.  Of course, you're going to have

9  location monitoring, so we're going to know where you are.

10         You must appear at all proceedings in this case and

11 surrender for service of any sentence that may be imposed.

12         I want you to continue to -- with your education.  I

13 want you to finish high school.  And that's a specific

14 condition of your bond.

15         I'm going to remove the condition that you actively

16 seek employment, because that's a condition we usually use for

17 adults, but when you finish high school, if you're still on

18 this bond, which I anticipate you probably will be, I want you

19 to look for some post-graduate education or start working, and

20 your Pretrial Services Officer can help you with that.

21         I'm going to direct that you have a mental health

22 assessment and treatment if indicated.

23         You must not possess any firearm, destructive device,

24 or other dangerous weapon.  No guns, no ammunition for guns.

25 And I cannot stress to you how seriously I mean this

1  condition.  Do you understand me?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  And there are none of those items in your

4  home right now?

5          THE DEFENDANT:  No, ma'am.

6          THE COURT:  And when you're away at school, you

7  cannot be in possession of, be in a car where any guns are, or

8  anything like that.  Do you understand?

9          THE DEFENDANT:  Yes, ma'am.

10          THE COURT:  Are we clear?

11          THE DEFENDANT:  Yes, ma'am.

12          THE COURT:  You must not use alcohol.  You're not 21,

13  so you're not lawfully allowed to use it.

14          I'm going to impose a condition of drug screening and

15  drug counseling or treatment if deemed necessary by your

16  Pretrial Services Officer.  Of course, you must not use or

17  unlawfully possess a narcotic drug or any controlled substance

18  unless prescribed by a licensed physician, and that includes

19  marijuana, which is illegal under federal law.

20          And I've already talked about the condition of home

21  detention and electronic monitoring.

22          You must maintain regular contact with your attorney,

23  which means generally no less than once every two weeks.

24          And you must report to the Pretrial Services Office

25  at least 30 minutes before all scheduled court proceedings in

1   this case.

2          Do you understand all the conditions of release that

3   I've just gone over with you?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  And, Ms. Jones, do you understand your

6   role as a third party custodian?

7          MS. JONES:  Yes, ma'am, I do.

8          THE COURT:  And do you promise to report to the

9   Pretrial Services Officer or the Court if he violates any of

10  these conditions of release?

11         MS. JONES:  Yes, ma'am.

12         THE COURT:  And you'll use your best efforts to

13  supervise him and to see that he complies?

14         MS. JONES:  Yes, ma'am.

15         THE COURT:  My Courtroom Deputy is now going to hand

16  you the bond papers for each of you to sign.  Ms. Jones,

17  there's a place on one page for you to sign, and a different

18  page for Mr. Roberts to sign.

19         MS. JONES:  Okay.

20         MR. BYRD:  Your Honor, he's signed the conditions.

21         THE COURT:  Thank you.

22         And have you signed, Ms. Jones?

23         MS. JONES:  Yes, ma'am.

24         THE COURT:  Thank you.

25         The last thing that I want to do is review with you,

1   Mr. Roberts, a number a serious penalties and sanctions that

2   may come into play if you were to engage in certain kinds of

3   conduct while on this bond.

4           First of all, if you were to violate the conditions

5   of your release, a warrant for your arrest can be issued.

6   You'd be brought back before me, and I would have to determine

7   whether, in fact, you violated your conditions of release, and

8   if I determine that you had, I very likely would revoke your

9   bond.  And if I did that, you'd be detained in jail until the

10  charges in this case are resolved, for no reason other than

11  your failure to comply with your bond conditions.  Do you

12  understand that?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  And if that were to happen, any sentence

15  you receive in this case, if you're convicted, could be

16  enhanced under the Federal Sentencing Guidelines based solely

17  on the fact that you violated your bond conditions.  Finally,

18  that could also be taken into consideration, the fact that you

19  violated your bond conditions and had been revoked, by the

20  BOP, and they would take that into consideration in

21  determining how to classify you, and that might determine

22  which prison you're held in or what privileges you receive

23  once you begin serving your sentence, assuming you're

24  convicted of the pending offense.

25          Second, and this is very serious, if you were to

1   commit a new federal crime while you're on this bond, you get

2   caught with a gun and charged with a new federal crime, you

3   can be sentenced to an additional term of imprisonment of not

4   more than ten years.  And that would be an enhanced sentence

5   that would be stacked on top of or be imposed in addition to

6   any sentence you receive in this case.  So, that could

7   substantially increase the length of any sentence you serve in

8   this case.

9        Third, if after you're released you knowingly fail to

10  appear as required by your release conditions, you can be

11  prosecuted for that offense as a separate crime for which

12  additional punishment can be imposed.

13       Finally, federal law makes is a separate felony,

14  punishable by five to ten years of imprisonment and a 250,000

15  dollar fine, or both, if you were to attempt to intimidate,

16  tamper with, or retaliate against any witness, juror,

17  informant, or Officer of the Court.

18       Do you now understand the penalties and sanctions

19  I've gone over with you?

20       THE DEFENDANT:  Yes, ma'am.

21       THE COURT:  I'm directing that the Marshals process

22  you out, and then -- do we have time today to get him set up

23  with location monitoring?

24       THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.  And

25  he can meet with Officer Stephen Daniels.

1          THE COURT:  You can meet with Officer Stephen Daniels

2    in the Probation Office.

3          And, Mr. Roberts, I'm giving you one chance in this

4    case.  And I hope you'll take advantage of it.

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  Is there anything further?

7          MS. ELDRIDGE:  Your Honor, just to note that there

8    still appears to be a state hold.

9          MS. JONES:  No, we got that taken care of.

10         MS. ELDRIDGE:  Well, a motion to revoke his bond in

11   7th Division was filed today, so I believe there may be still

12   some state issues that he has to deal with before he gets out

13   of their custody.

14         THE COURT:  I understand.  Well, all I can deal with

15   is your federal custody, and I've done that.  And I'll leave

16   it to your attorney to kind of figure that out.

17         MR. BYRD:  I'm aware of the motion to revoke, Your

18   Honor, but I -- I was under the impression that he was in

19   federal custody, that some fail to comply issue had been

20   withdrawn.  But, I guess the next step will be for -- where is

21   -- Marshal Nichols, I imagine, will be contacting Pulaski

22   County directly to see what the deal is on that.

23         THE COURT:  Right.

24         MR. BYRD:  So, if he is released today, of course,

25   we'll go meet with Officer Daniels, but, if he's not, we'll be

1    waiting for the state --

2             THE COURT:  Exactly.

3             MR. BYRD:  -- matters to be resolved.

4             THE COURT:  Exactly.

5             MR. BYRD:  So, we're -- we're clear on that.

6             THE COURT:  Okay.  Is there anything further?

7             MS. ELDRIDGE:  No, Your Honor.

8             MR. BYRD:  No, Your Honor.

9             MS. JONES:  Thank you.  I appreciate it.

10            THE COURT:  Thank you.

11            We're adjourned.

12       (Adjournment at 3:44 p.m.)

13            ELECTRONIC SOUND RECORDING CERTIFICATION:

14   I, court approved transcriber, certify that the foregoing is a

15   correct transcript from the official electronic sound

16   recording of the proceedings in the above-entitled matter.

17

18   /s/Robin Warbritton              January 14, 2022
     Signature of Approved Transcriber    Date

19

20   Robin Warbritton
     Typed or Printed Name

21

22

23

24

25